# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Select Comfort Corporation; and Select
Comfort SC Corporation,

Civil No. 12-2899 (DWF/SER)

Plaintiffs,

v.

**MEMORANDUM
OPINION AND ORDER**

John Baxter; Dires, LLC d/b/a Personal
Touch Beds and Personal Comfort Beds;
Digi Craft Agency, LLC; Direct Commerce,
LLC d/b/a Personal Touch Beds; Scott
Stenzel; and Craig Miller,

Defendants.

---

Andrew S. Hansen, Esq., Cynthia S. Topel, Esq., Dennis E. Hansen, Esq., Elizabeth A.
Patton, Esq., and Samuel R. Hellfeld, Esq., Fox Rothschild LLP, counsel for Plaintiffs.

Barbara P. Berens, Esq., Carrie L. Zochert, Esq., and Erin K. Fogarty Lisle, Esq., Berens
& Miller, PA, counsel for Defendant John Baxter.

David T. Schultz, Esq., Joseph P. Ceronsky, Esq., and Michael C. McCarthy, Esq.,
Maslon LLP, counsel for Defendants Dires, LLC, d/b/a Personal Touch Beds and
Personal Comfort Beds, Scott Stenzel, and Craig Miller.

Defendant Digi Craft Agency, LLC, *pro se*.

Defendant Direct Commerce, LLC, d/b/a Personal Touch Beds, *pro se*.

---

# INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by

Defendant Dires, LLC ("Dires" or "Personal Comfort"), Craig Miller ("Miller"), and

Scott Stenzel ("Stenzel") (together, "Dires Defendants") (Doc. No. 221); a Motion for

Summary Judgment brought by Defendant John Baxter ("Baxter") (Doc. No. 226); and a

Motion for Partial Summary Judgment brought by Plaintiffs Select Comfort Corporation

("Select Comfort") and Select Comfort SC Corporation ("Comfortaire") (together,

"Plaintiffs") (Doc. No. 233).  For the reasons set forth below, the Court grants in part and

denies in part the motions.

## BACKGROUND

Plaintiffs design, manufacture, and market adjustable air beds[1] and related

products.  (Doc. No. 239 ("Somers Aff.") ¶ 2.)  Select Comfort markets its products

under the "Sleep Number" brand.  (*Id.* ¶ 3.)  Sleep Number products are sold in over 450

Sleep Number branded stores, online, and over the phone.  (*Id.*)  Select Comfort is the

leading manufacturer of adjustable air beds with a market share over 90%.  (Doc. No. 224

("McCarthy Decl.") ¶ 2, Ex. A ("Marino Report") ¶ 15.)  Select Comfort owns registered

trademarks for "Sleep Number," "Select Comfort," and "What's Your Sleep Number."

(Doc. No. 53 (Second Amend. Compl. ("SAC")) ¶¶ 14-16, Exs. A-C.)

Comfortaire also markets and sells adjustable air beds, marketed under the

"Comfortaire" mark.  (Doc. No. 237 ("Karr Aff.") ¶ 2.)  Comfortaire is the second largest

seller of adjustable air beds, and it sells its products through over 200 retailers, online,

and over the phone.  (*Id.*)  Comfortaire owns the registered trademark for "Comfortaire."

(SAC ¶ 17, Ex. D.)  Select SC Corporation acquired Comfortaire in January 2013 via a

---

[1]    An adjustable air bed is one that may be made firmer or less firm by changing the
number on a remote control.

merger.  (*Id*. ¶ 37.)  Prior to the merger, Comfortaire sold a line of adjustable air beds that

competed with Select SC Corporation's products.  Select SC Corporation sued

Comfortaire for trademark infringement, and the parties eventually settled.  (*Id*.

¶¶ 38-41.)

Direct Commerce, LLC ("Direct Commerce") did business from approximately

July 2011 to August 2012 and is now in forfeited status.  (Doc. No. 236 ("Hansen Aff.")

¶ 1, Ex. 1 at Answer 2.)  Direct Commerce was owned by Digi Craft Agency ("DCA"),

whose members were Defendants Stenzel and Baxter, as well as Marc Barriger (who is

not a defendant).  (*Id*.; Hansen Aff. ¶ 3, Ex. 2 ("Stenzel Dep.") at 26, 48-49; Hansen Aff.

¶ 4, Ex. 3 ("Baxter Dep.") at 162-63; Hansen Aff. ¶ 5, Ex. 4 ("Barriger Dep.") at 33.)

Direct Commerce sold beds under the "Personal Touch" and "Personal Comfort" brands.

(Stenzel Dep. at 138; Baxter Dep. at 30, 190.)  Baxter and Stenzel were involved in

advertising and website design at Direct Commerce.  (Baxter Dep. at 13-14, 32; Stenzel

Dep. at 51-53.)  DCA dissolved in February 2013.  (Hansen Aff. ¶ 1, Ex. 1 at Answer 2.)

Defendants submit evidence that while Direct Commerce and Dires had some common

employees, the two companies are separate corporate entities.  (Doc. No. 225 ("Cernosky

Decl.") ¶ 3, Ex. 4 at Answer 2.)

Dires is a limited liability company that was formed by Sizewise Rentals, LLC

("Sizewise"), Stenzel, Miller, and Baxter.  (*Id*.)  Baxter is the former Director of

Marketing for Dires and was in charge of internet marketing and advertising.  (Hansen

Aff. ¶ 2, Ex. 7 at Answer 5; Hansen Aff. ¶ 9, Ex. 8 ("Dires 30(b)(6) Dep.") at 77-78;

Hansen Aff. ¶ 7, Ex. 6 ("Baxter Dep. II") at 15-16; Baxter Dep. at 22, 27, 190).)  Baxter

also trained salespersons.  (*Id*.)  Stenzel was the Director of Operations at Dires and is

now the Director of Marketing and Advertising.  (Hansen Aff. ¶ 2, Ex. 7 at Answer 5;

Stenzel Dep. at 24-25.)  Stenzel has responsibility over the website and advertising.

(Baxter Dep. II at 15-16, 68; Hansen Aff. ¶ 2, Ex. 7 at Answer 5.)  Miller is a managing

member at Dires and since the filing of this lawsuit has had input into advertising.

(Hansen Aff. ¶ 10, Ex. 9 ("Miller Dep.") at 105-06, 166-70; Baxter Dep. II at 15-16.)

Miller is also the Chief Manufacturing Officer for Sizewize.  (Miller Dep. at 30-33.)

Baxter was an employee of Comfortaire's parent company prior to the merger with

Select SC Corporation, and was responsible for developing Comfortaire's online

advertising.  (Doc. No. 231 ("Zochert Aff.") ¶ 4, Ex. 3 ("Karr Dep.") at 65.)  In July

1998, Baxter participated in and completed Google's AdWords training program.

(Baxter Dep. at 44-47.)[2]  Comfortaire used Select Comfort's trademarks as search terms

in Google's AdWords program.  (Baxter Dep. at 82-89.)  Comfortaire also used "Number

Bed" as a search term.  (Karr Dep. at 199.)  As a result, when a consumer entered a key

word search, like "Sleep Number" or "Number Bed," Comfortaire's ads would appear in

---

[2]     The AdWords program teaches participants about Google's advertising guidelines
and methods to optimize advertising results.  (Baxter Dep. at 44-47.)  Google suggests
that advertisers choose specific "keywords that are most relevant to your product or
service . . . to increase the chances that your ad is showing to people who are most
interested in your product or service."  *See*
https://support.google.com/adwords/answer/2497976.

the "ads" section of the internet search results, next to Select Comfort's ads.  (Cernosky

Decl. ¶ 2, Ex. 8 ("Kent Report") ¶¶ 49-51.)[3]

Defendants market and sell beds online and over the phone.  (Stenzel Dep. at 75.)

None of the Defendants have been authorized retailers, distributors, or sellers of Sleep

Number or Comfortaire.  (Somers Aff. ¶ 4; Karr Aff. ¶ 3.)

On November 16, 2012, Select Comfort sued Dires and Baxter.  (Doc. No. 1.)  On

November 8, 2013, Select Comfort filed a Second Amended Complaint adding

Comfortaire as a plaintiff and Miller, Stenzel, Direct Commerce, and DCA as defendants.

(Doc. No. 53.)[4]  The following causes of action remain:  (1) Federal Trademark

Infringement (Count I); (2) Federal Unfair Competition (Count II); (3) Federal Dilution

of Trademark (Count III); (4) False Advertising (Count IV); (5) Deceptive Trade

Practices (Count V); and (6) Unjust Enrichment (Count IX).[5]  (SAC.)

Defendants deny any unlawful or actionable conduct and assert three

counterclaims.  Relevant to the present motions, in Counterclaim I, Defendants seek a

declaration that the phrase "Number Bed" is descriptive and is incapable of acquiring

secondary meaning or functioning as a trademark.  In Counterclaim II, Defendants also

---

[3]     Whether other competitors' ads would appear would depend on the cost-per-click
("CPC") keywords that the competitors bid on and the prices competitors were willing to
pay.  (Kent Report ¶¶ 49-51.)

[4]      Direct Commerce and DCA did not answer the Second Amended Complaint and
are in default.  (Doc. No. 82.)

[5]     Plaintiffs originally asserted ten causes of action, four of which have been
dismissed.  (Doc. No. 135.)

seek a declaration that the use of "Select Comfort," "Sleep Number," and "Comfortaire" as keywords does not infringe Plaintiffs' trademark rights.  In Counterclaim III, Defendants seek to cancel two of Select Comfort's trademark registrations because the phrase "Sleep Number" is generic.  In addition, Defendants assert several affirmative defenses, including unclean hands.

The parties have filed cross-motions for summary judgment.  Plaintiffs seek summary judgment on their trademark infringement, unfair competition, and related state-law claims; on particular elements of its false advertising and related state-law claims; on Defendants' Counterclaims asserting that "Sleep Number" is generic and that "Number Bed" cannot function as a trademark; and on Defendants' "Number Bed" and unclean hands affirmative defenses.  Baxter moves for summary judgment on Plaintiffs' trademark infringement and dilution claims, unjust enrichment claim, and any claim founded on successor liability, as well as summary judgment on Counterclaims I and II. The Dires Defendants move for summary judgment on all six of Plaintiffs' claims, as well as any possible claim that one or more of the Dires Defendants may be liable for the conduct of DCA and Direct Commerce.  The Dires Defendants also move for summary judgment on Counterclaim I.

## DISCUSSION

## I.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Internet and Search Engine Keyword Advertising

Because much of this case involves internet and key-word based advertising as used in internet search engines, the Court will provide a brief summary of how this type of advertising works and the background of Defendants' advertising to which Plaintiffs object.

### A.    General Overview

Online advertising consists of Pay-Per-Click ("PPC"), organic search, and display. (Doc. No. 238 ("O'Hanlon Aff.") ¶ 4.) When a consumer performs a search engine inquiry on the internet, the search engine, such as Google, returns both "organic" results

and paid advertising results.  (Kent Report ¶¶ 18-24; *see also*  J. Thomas McCarthy,

MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION ("*McCarthy on Trademarks*")

§ 25A:4 at 26-27 (4th ed. 2015).)  PPC ads appear in search engines in response to certain

search terms—"keywords"— for which advertisers have bid to have their advertisements

appear.  (O'Hanlon Aff. ¶ 5; *see also McCarthy on Trademarks* § 25A:4 at 26; Kent

Report ¶¶ 49-52).)  These advertisements often appear at the top or on the right-hand side

of the results page.  (O'Hanlon Aff. ¶ 5.)  On Google, the paid search results are labeled

with "Ad" (highlighted in yellow), and the web address of the company sponsoring the

advertisements is displayed under the ad text.  (Kent Report ¶ 29.)  Advertisers are

charged for these ads only when a consumer clicks on the advertisement.  (O'Hanlon Aff.

¶ 5.)  The ads are displayed based on who purchased the keywords and on a "quality

score" that rates the likely relevance to the consumer of the company's ad and webpage

linked to from the ad.  (Cernosky Decl. ¶ 2, Ex. 9.)  Using specific keywords that

describe a company's products or services will improve the success of the ad.  (*Id*. ¶ 2,

Ex. 10.)  Google sells both generic words (such as "bed"), but also keywords that contain

competitors' trademarks, so that an ad will appear in the ad section of search results when

a consumer searches for a competitor's trademark.  (Kent Report ¶¶ 51-54.)

 Organic advertising consists of free listings generated by the search engine that it

views as relevant for the keyword entered.  (O'Hanlon Aff. ¶ 6.)  Advertisers can engage

in search engine optimization ("SEO") efforts to try to increase their organic rating.  (*Id*.)

One SEO method involves implementing various attributes on a company's own website,

such as title tag lines for each webpage and by using certain words or phrases in meta

information.  (*Id.*)  Search engines use this data to inform how a page will rank.  (*Id.*)

Another method is ensuring that third-party websites contain links to the company's

website.  In general, more and higher-quality links pointing to a website will increase that

website's rankings in organic results.  This is referred to as "link-building" or

"back-linking."  (*Id.*)  Display advertisements consist of banners placed on third-party

websites.  (*Id.* ¶ 7.)  Advertisers pay publishers, ad exchanges, and/or ad networks to

appear on particular websites.  (*Id.*)  Banner advertisements are clickable and look like

signs or images.  (*Id.*)

### B.    Defendants' Advertising

Personal Comfort relies almost entirely on keyword advertising and nearly 80% of

its advertising budget goes towards PPC ads.  (Cernosky Decl. ¶ 2, Ex. 6 at 160-61.)

Personal Comfort buys keywords such as "Number Bed," "Select Comfort," and "Sleep

Number."  (Answer and Countercl. ¶¶ 55-56.)  Plaintiffs do not object to Personal

Comfort's use of Plaintiffs' marks as keywords for internet searches.  Instead, Plaintiffs

object to Personal Comfort's use of the keywords in conjunction with what they contend

to be infringing advertisements.

When a consumer clicks on a Personal Comfort ad link, they are taken to Personal

Comfort's website, on which Personal Comfort compares its products to Sleep Number

products.  A screen shot of the Personal Comfort website that their keyword ads link to

appears in part as follows:



(Ceronsky Decl. ¶ 2, Ex. 1.)  On this page, Personal Comfort's logo is displayed at the top of the page, beneath which smaller text reads "Compare Us to Sleep Number Bed®." (*Id*.)  Below that, it says "PREFERRED OVER SLEEP NUMBER® BED."  (*Id*.)  On the menu on the left side of the page under the bold "Compare" heading, it reads "vs. Sleep Number's®."  (*Id*.)  There is another bold heading that reads "The Sleep Number® Bed versus Personal Comfort® Bed Comparison."  (*Id*.)  And lower on the page (not depicted), there is another link to "Compare to Sleep Number®," and the following:  "We invite you to do your homework and check out the competition."  (*Id*. at 2.)  At the very bottom of the webpage, the following disclaimer appears:

> No affiliation exists between Personal Comfort® or Sleep Number Bed®. No product belonging to Select Comfort® or Sleep Number Bed® is sold on this site and any reference is for comparison purposes only.  Select Comfort® and Sleep Number Bed® are registered trademarks of Select Comfort® Corporation you can visit them at www.sleepnumberbed.com

(*Id*.)

In the record, there are numerous additional advertisements to which Plaintiffs object.  For example, Plaintiffs submit evidence of Defendants' use of various "billboards" that appear in the resulting advertisements displayed in PPC advertising.  These "billboards" include, for example:  "**Sleep** 55% Off **Number Beds**"; "**Number Bed Sleep** Sale 60% -Closeout Sale"; "**Comfort Air** Beds On **Sale**"; "**50% Off Sleep Number Beds**"; "**50%Off Queen Number Beds . . . PersonalComfortBed.Com/SleepNumber**"; "**Select** 55%Off **Comfort** Bed PersonalComfortBed.Com/SelectNumber."  (Hansen Aff. ¶¶ 39-41, 49, 50, Exs. 38-40, 48, 49 (emphasis in original).)

In addition, Plaintiffs object to certain display/banner advertisements that Defendants place on third-party websites, such as:





(Hansen Aff. ¶¶ 66-67, Exs. 65-66.)

Plaintiffs also argue that for SEO purposes, Defendants use Plaintiffs' marks (in phrases such as "Sleep Number bed" and "Sleep Number Beds on sale") in hyperlinks on

third-party websites that when clicked on lead to Personal Comfort's website.  (Dires

30(b)(6) Dep. at 362; Hanson Aff. ¶ 60, Ex. 59 ("Kent Dep.") at 74; Hanson Aff.

¶¶ 53-54, 56-58, Exs. 52-53, 55-56.)

Plaintiffs also object to Defendants' use of Plaintiffs' marks on the Personal

Comfort website, including, for example, the use of "Sleep Number Bed" in the title tag

of the Internet Explorer tab (Hanson Aff. ¶ 73; Barriger Dep. at 131-40; Kent Dep. at

57-58, 63-64); the use of meta-tags on Defendants' websites (i.e., Doc. No. 247 ("Hansen

Aff. II") ¶ 3, Ex. 156 ("50% OFF Sleep Number bed")); and the use of "WHAT'S YOUR

NUMBER?"

In addition, "Number Bed" appears in the Personal Comfort logo:



(Hansen Ex. ¶ 71, Ex. 70.)

Plaintiffs also take issue with Defendants' use of a "lead generating" website,

Mattress Quote.  The Mattress Quote website was created by Baxter and Stenzel, and it

allows consumers to obtain quotes on a number of brands, including Sleep Number and

Comfortaire products.  (Hansen Aff. ¶ 77, Ex. 74.)  Despite being billed as an

independent website, Plaintiffs submit evidence that when consumers select either Sleep

Number or Comfortaire, they receive a quote from Defendants.  (Hansen Aff. ¶¶ 78-81,

Exs. 75-78.)  Moreover, Plaintiffs submit evidence that, in responding to a direct inquiry

from the Mattress Quote website, Defendants responded purporting to be "Sleep

Number."  (*Id*. ¶ 78, Ex. 75.)

Finally, Plaintiffs have submitted evidence that when consumers visit Defendants' website, call Defendants' phone number, or participate in a "live chat," Defendants have made allegedly false statements to the callers.  (*See generally* Doc. No. 235 at 8-9.)

## III.    Protectability of the Relevant Marks

As an initial matter, the Court analyzes the parties' arguments with respect to the protectability of the relevant trademarks.  Plaintiffs have trademark registrations for Sleep Number, Select Comfort, What's Your Sleep Number, and Comfortaire.  These registrations are *prima facie* evidence of the validity of the marks. 15 U.S.C. § 1057(b). These marks are also incontestable.  (SAC ¶¶ 14-17, Exs. A-D.)  Incontestability provides conclusive evidence of the mark's validity, its registration, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce.  15 U.S.C. §1115(b).  A defendant contesting an alleged incontestable mark must prove actual genericness, proof of descriptiveness is not enough.  *Woodroast Sys., Inc. v. Rests. Unltd., Inc.*, 793 F. Supp. 906, 912 (8th Cir. 1992).  Plaintiffs also assert trademark rights in "Number Bed," an unregistered trademark.  A party asserting unregistered trademark rights bears the burden of establishing those rights.  *Ale House Mgmt., Inc. v. Raleigh Ale House Inc.,* 205 F.3d 137, 140 (4th Cir. 2000).

A trademark answers the question, "Who are you?" (i.e., what is your source), while the name of a product answers, "What are you?"  *See McCarthy on Trademarks* § 12:1.  In trademark law, words are classified in the following categories, from the least protectable to the most:  generic, descriptive, suggestive, and arbitrary.  *See Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005).  A

generic term refers to the name for the nature of an article and is not entitled to trademark protection.  *Id.*

Genericness can be demonstrated "from any competent source."  *In re Merrill Lynch, Piere, Fenner, & Smith, Inc.*, 828 F.2d 1567, 1570 (Fed. Cir. 1987).  These sources may include a plaintiff's generic use, competitors' uses, third-party use in trademark registrations, and other publications.  *See Nartron Corp. v. STMicroelecs., Inc.*, 305 F.3d 397, 406-07 (6th Cir. 2002).  If a mark is found to be generic, no amount of secondary meaning may resurrect it, and no party may be found to infringe it.  *Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535, 547 (4th Cir. 2004).

A mark is generic "when it has become the name of a product (e.g. 'sandwich' for meat between slices of bread) or a class of products."  *TE-TA-Ma Truth Found.—Family of URI, Inc. v. World Church of Creator*, 297 F.3d 662, 666 (7th Cir. 2002).  The test for genericness centers on public perception.  *Anheuser-Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 638 (8th Cir. 1984) ("What do the buyers understand by the word for whose use the parties are contending?" (citation omitted)).  If the primary significance to consumers is a particular brand, then it is not generic.  A consumer survey is the most definitive evidence of genericness, but absent such a survey, a court may consider indirect evidence, such as use by defendants, the trademark owner, or a third-party.  *See McCarthy on Trademarks* § 12:14.[6]

---

[6]    Where the "proponent of trademark status itself uses the term as a generic name, [it] is strong evidence of genericness."  *McCarthy on Trademarks* § 12:13.  "A kind of estoppel arise when the proponent of trademark use is proven to have itself used the term

(Footnote Continued on Next Page)

A term is descriptive if it conveys an "immediate idea of the ingredients, qualities or characteristics of the goods that it sells." *Frosty Treats*, 426 F.3d at 1005 (determining that, at best, the mark "Frosty Treats" is descriptive because "Frosty Treats is in the business of selling frozen desserts . . . [and] 'Frosty Treats' conveys an immediate idea of the qualities and characteristics of the goods that it sells"). Suggestive marks require imagination to reach a conclusion as to the product's nature. *Id*. at 1005. Arbitrary marks are words, symbols, or pictures with common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality, or characteristic of those goods or services. *See McCarthy on Trademarks* § 11.11.

In this action, Defendants contest the protectability of "Sleep Number" and "Number Bed." The Court considers each in turn.

## A.    Sleep Number

In Counterclaim III, Defendants argue that they are entitled to a declaration that Sleep Number is generic when used in connection with Select Comfort's adjustable air bed mattress products, and that the "Sleep Number" mark was abandoned through Select Comfort's own course of conduct causing the mark to become generic. Defendants also seek the cancellation of the trademark registrations associated with "Sleep Number."[7]

---

(Footnote Continued From Previous Page)
before the public as a generic name, yet now claims that the public perceives it as a trademark." *Id*.

[7]    Plaintiffs have characterized Defendants' counterclaim on genericness as one based on an abandonment theory, which Defendants must demonstrate via clear and convincing evidence. Defendants acknowledge that they have asserted alternative

(Footnote Continued on Next Page)

Defendants contend that Select Comfort has used "Sleep Number" generically for years, pointing to evidence that Select Comfort introduced the phrase "Sleep Number" as a desirable product feature, and has spent more than fourteen years and millions of dollars to educate the buying public about what a sleep number is, how someone determines his or her sleep number, and why the public should purchase a bed with a sleep number feature. Defendants submit that Plaintiffs used and advertised the term "Sleep Number" as a numerical firmness setting for years and, not until 2008, did Select Comfort begin using it as a brand (by adding the word "setting," "bed," or "store" to modify "sleep number"). Defendants also submit that a survey commissioned by Select Comfort in June 2012 establishes the genericness of the "Sleep Number" mark. (Doc. No. 255 ("Cernosky II Decl.") ¶ 2, Ex. 58 ("Rappeport Survey") at 9-10.) In addition, Defendants point to evidence that Select Comfort used the mark generically in public filings and marketing campaigns by, for example, describing the sleep number feature as a firmness setting and feature. Further, Defendants submit evidence that the public uses "Sleep Number" generically. (Cernosky Decl. II ¶ 2, Ex. 7 ("Widmaier Report") at 105-25.)

Plaintiffs, on the other hand, contend that the "Sleep Number" mark is not generic as a matter of law and, therefore that they are entitled to summary judgment on this counterclaim. In support, Plaintiffs point to survey evidence that they claim definitively

---

(Footnote Continued From Previous Page)

theories in support of their counterclaim, but maintain that Sleep Number is generic *ab initio*.

demonstrates that "Sleep Number" is a brand.  (Hansen Aff. ¶ 156,  Ex. 153 ("Poret Aff.),

Ex. A ("Poret Survey") at 65.)[8]  In particular, in the Poret Survey, 83.5% responded that

they view "Sleep Number" as a brand name.  (*Id*.)[9]  Plaintiffs also submit evidence that

secondary meaning studies have similarly shown that "Sleep Number" is a brand.  (*Id*.

at 67.)  For example, a survey conducted by Robert Reitter indicated that 62% of

consumers associate "Sleep Number" with the mattresses of one company.  (*Id*.)

Plaintiffs also point out that Defendants did not produce a survey of their own to

demonstrate that "Sleep Number" is generic, and they contend that Defendants' own use

of "Sleep Number" demonstrates that the mark is not generic.  For example, Plaintiffs

point to instances where Defendants use "Sleep Number" as a brand on its website

homepage:  "Compare Us to Sleep Number Bed®"; "The Sleep Number® Bed versus

Personal Comfort® Bed Comparison."  In addition, Plaintiffs point to numerous incidents

where Defendants identify "Sleep Number" as a brand in both internal and consumer

communications and to evidence that instead of using "Sleep Number" to describe or

identify their products, Defendants use alternative terms, such as "adjustable air beds."

Plaintiffs also contend that the corporate representative of Dires admitted that "Sleep

Number" was a brand.  Finally, Plaintiffs argue that any limited alleged misuse of the

---

[8]     Plaintiffs argue that they did not introduce a product that differed from an
established class in a significant, functional characteristic (because the genus of
adjustable air beds existed), but it merely introduced a brand name.

[9]     Defendants question the reliability of the Poret report, which was conducted in
2014, two years after the Rappeport Survey, which Defendants submit demonstrates the
genericness of the phrase "Sleep Number."

"Sleep Number" mark does not render the mark generic, evidenced by surveys demonstrating that consumers view "Sleep Number" as a brand.

The classification of a given mark is a factual issue. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 n.18 (3d Cir. 1991). Here, the Court concludes that there are significant and material factual issues that preclude the Court from ruling on the appropriate classification of the "Sleep Number" mark on summary judgment. The jury will have to resolve the factual issues relevant to the classification of the marks to determine if "Sleep Number" is generic. In addition, to the extent it becomes necessary, the jury will have to weigh the evidence to determine if "Sleep Number" is descriptive or suggestive for purposes of determining the mark's conceptual strength.

### B.     Number Bed

Defendants also assert a counterclaim seeking a declaration that Plaintiffs do not have trademark rights in the phrase "Number Bed." Defendants and Plaintiffs both move for summary judgment on this counterclaim. In support of their counterclaim, Defendants assert that Plaintiffs have never used "Number Bed" as a trademark. In the alternative, Defendants claim the term is generic, or at best descriptive, and that Plaintiffs are unable to demonstrate secondary meaning. Plaintiffs, on the other hand, argue that "Number Bed" is suggestive, or in the alternative, descriptive with established secondary meaning.

There is no dispute that "Number Bed" is not a registered trademark. Therefore, Plaintiffs bear the burden of establishing their rights in "Number Bed." As with the "Sleep Number" mark, the Court concludes that there are fact issues with respect to the

correct classification of the "Number Bed" mark, and it is therefore within the province

of the jury.  In addition, should the jury determine that "Number Bed" is descriptive, the

issue of secondary meaning will come into play.  *Co-Rect Prods. v. Marvy! Advert.*

*Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985) (explaining that with respect to

an unregistered descriptive mark, the user must show acquired secondary meaning).

"To establish secondary meaning, the user must show that the mark or symbol by

long and exclusive use and advertising in the sale of the user's goods has become so

associated in the public mind with such goods that it serves to identify them and

distinguish them from the goods of others."  *Id.* at 1330 (citations and quotation marks

omitted).  Secondary meaning is an association formed in the minds of the consumers

between the mark and the source or origin of the product.  *See Truck Equip. Serv. Co. v.*

*Fruehauf Corp.*, 536 F.2d 1210, 1219-20 (8th Cir. 1976).  The ultimate inquiry is whether

in the consumer's mind the mark denotes a "single thing coming from a single source."

*Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1301 (5th Cir. 1985) (quotation

marks omitted).

Plaintiffs argue that they have acquired trademark rights in "Number Bed"

because it has acquired secondary meaning in the minds of consumers.  In support,

Plaintiffs point to the Butler Survey, which Plaintiffs submit demonstrates that

approximately half of all respondents believe "Number Bed" is associated with one

company.  (Hansen Aff. ¶ 157, Ex. 154 ¶ 2, Ex. A ("Butler Survey") at 9, 12.)  Plaintiffs

argue that these results are persuasive evidence that "Number Bed" has secondary

meaning, and thus trademark status.  In addition, Plaintiffs submit evidence of the long-

term use of the mark, extensive advertising, sales and number of consumers, established place in the market, and proof of actual copying, to demonstrate secondary meaning.

Defendants argue that, as a matter of law, Plaintiffs cannot establish secondary meaning. In particular, Defendants argue that the Butler Survey fails because it was conducted *after* Plaintiffs allege that Defendants began using the mark. Defendants further argue that Plaintiffs cannot establish secondary meaning because they have not used "Number Bed" by itself to promote their products.

The Court concludes that there are fact issues that preclude summary judgment on the issue of secondary meaning.

## IV.    Trademark Infringement

In Counts I and II, Plaintiffs assert claims for trademark infringement and unfair competition. Plaintiffs and Defendants both move for summary judgment on Plaintiffs' trademark infringement claims. To establish a claim for trademark infringement, a plaintiff must show that it owns a valid protectable trademark and that a defendant's unauthorized use of the trademark creates a likelihood of confusion. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011). Plaintiffs assert infringement of "Number Bed," "Sleep Number," "Select Comfort," "What's Your Sleep Number?" and "Comfortaire." As discussed above, the jury will decide whether the "Number Bed" and "Sleep Number" marks are protectable. Plaintiffs own the trademark registrations of the remaining asserted marks--"Select Comfort," "What's Your Sleep Number?" and "Comfortaire."

These registrations are prima facie evidence of ownership of the marks.  15 U.S.C. §1057(b).

### A.    Fair Use

Defendants argue that their use of Plaintiffs' marks constitutes fair use.  The burden rests on the defendant to establish the applicability of the "fair use" defense.  *See DowBrands, L.P. v. Helene Curtis, Inc.*, 863 F. Supp. 963, 967 (D. Minn. 1994).  There are two types of "fair use" of a trademark:  "classic fair use" and "nominative fair use."  *See generally McCarthy on Trademarks* § 23.11.  Both are types of legal, non-infringing use.  *Id*.  "Classic fair use" is a defense to infringement when a junior user argues that it is not using a phrase or word in a trademark sense, but only to describe the junior user's goods or services.  *Id*.  "Nominative fair use" is the use of another's trademark to identify the trademark owner's goods and services in order to "name" the real owner of the mark.  *Id*.

Defendants argue that Personal Comfort's use of "Number Bed" is classic fair use, and therefore Defendants cannot infringe either "Sleep Number" or "Number Bed."  To satisfy the fair use test, Defendants must demonstrate that:  (1) the use of Plaintiffs' marks is to indicate the category of goods Defendants sell, not the origin of the goods; (2) Plaintiffs' marks (i.e., "Number Bed") are descriptive of Defendants' products; and (3) the use of Plaintiffs' marks is in good faith only to describe its own goods to consumers.  *See, e.g.*, *Woodroast Sys., Inc.*, 793 F. Supp. at 913-14 (denying summary judgment on issue of fair use); *DowBrands*, 863 F. Supp. at 969-70 (same; explaining intent must often be established through circumstantial evidence and an assessment of

credibility).  In the present action, material issues of fact exist with respect to Defendants'

assertion that its advertisements constitute "classic fair use."  In particular, the jury will

have to weigh the evidence and decide whether Defendants' use of Plaintiffs' marks was

made in good faith and only to describe its own products, or whether the use was

intended to improperly infer a connection between Defendants' products and Plaintiffs'

brand.

Defendants also argue that Personal Comfort's use of Plaintiffs' marks on its

website is "nominative fair use."  Three elements are required to satisfy the "nominative

fair use" analysis:  (1) the product or service in question must not be readily identifiable

without use of the trademark; (2) only so much of the trademark may be used as is

reasonably necessary to identify the product or service; and (3) the user must do nothing,

in conjunction with the mark, to suggest sponsorship or endorsement by the trademark

owner.  *See New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308-09 (9th

Cir. 1992.)  Defendants argue that they engage in comparative advertising and that they

use Plaintiffs' marks to distinguish Defendants' products from (as opposed to affiliate

with) Plaintiffs' products or brand.  Again, the Court concludes that material issues of

fact exist with respect to Defendants' assertion that its advertisements constitute

"nominative fair use."  In particular, the jury will have to weigh the evidence and decide

whether Defendants' use meets the elements of "nominative fair use," or whether the use

of Plaintiffs' marks suggests sponsorship or endorsement by Plaintiffs.  Accordingly,

summary judgment on this defense is denied.

**B.      Likelihood of Confusion**

The Court now turns to whether either Defendants or Plaintiffs are entitled to summary judgment on the issue of likelihood of confusion.  At issue are various advertisements and marketing tactics used by Defendants.  For example, Plaintiffs object to Defendants' use of Plaintiffs' marks exactly or in similar permutations:  (1) as keywords that lead to display advertisements (such as, "**Sleep** 55% Off **Number Beds**"; "**Number** Bed **Sleep** Sale 60% -Closeout Sale"; "**Comfort Air** Beds On **Sale**"); (2) in display/banner advertisements (such as "Number Bed Closeout Sale"); (3) for SEO purposes, by placing hyperlinks (such as "Sleep Number bed" and "Sleep Number Beds on sale") on third-party websites that, when clicked on, lead to Personal Comfort's website; and (4) on its own website.  The parties disagree over whether the factors weigh in favor or against of a likelihood of confusion.

**1.      Initial Interest Confusion**

As an initial matter, Plaintiffs argue that there is substantial evidence of both initial interest and point of sale confusion.  Under the Lanham Act, there are at least two distinct types of actionable customer confusion:  (1) confusion existing at the time of purchase; and (2) initial interest confusion.  Initial interest confusion is based on confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.  *See McCarthy on Trademarks* § 23:6.

The parties dispute whether initial interest confusion can be a basis for liability in the Eighth Circuit.  Plaintiffs point out that the majority of circuits that have considered the issue have adopted initial interest confusion as a basis for liability.  *Id*. § 23:6 at n.2

(collecting cases).  However, in *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613

F.3d 754 (8th Cir. 2010), the Eighth Circuit "decline[d] [plaintiff's] invitation to adopt

the 'initial interest confusion' doctrine *in this case*," which involved flavor delivery

systems that are sold to sophisticated consumers after a collaborative process.  *Id*. at 766,

769 (emphasis added).  In *Sensient*, the Eighth Circuit explained that "even if the doctrine

applied generally in this circuit, it would not apply" where, "although the products are

similar, . . . the customers are sophisticated and exercise a relatively high degree of care

in making their purchasing decisions."  *Id*.  Plaintiffs submit that the Eighth Circuit Court

of Appeals, in *Sensient*, acknowledged the doctrine but has not yet had the facts fitting it.

The Court notes that the Eighth Circuit in *Sensient* neither rejected nor adopted the

initial interest confusion doctrine.  Rather, it declined to formally adopt the doctrine

because it would not apply to the facts of that case.  Similarly, even if the initial interest

confusion doctrine is recognized in the Eighth Circuit after *Sensient*, this is not an

appropriate case for its application.  Not only are Personal Comfort and Select Comfort

beds expensive (the average Select Comfort bed costs between $1,600 and $2,300) (*see*

Marino Report ¶¶ 26, 53-54), they are specialty mattresses, and they are purchased on-

line.  These factors lead to the conclusion that consumers would exercise a high degree of

care in purchasing such a mattress.  *See, e.g.*, *Lovely Skin, Inc. v. Ishtar Skin Care Prods.*,

*LLC*, 745 F.3d 877, 889 (8th Cir. 2014) (applying the principle that consumer care when

purchasing more expensive goods is higher; online cosmetics purchases averaging $100);

*Clam Corp. v. Innovative Outdoor Sols., Inc.,* Civ. No. 08-5895, 2008 WL 5244845, at *3

(D. Minn. Dec. 15, 2008) (finding that $200-$700 ice fishing shelters weigh against

likelihood of confusion).  Therefore, Plaintiffs' trademark infringement claim will require

Plaintiffs to establish a likelihood of actual confusion at the time of purchase.

### 2.    Likelihood of Confusion Factors

In determining whether there is a likelihood of confusion, the court considers six

factors:  (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's

mark and the allegedly infringing mark; (3) the degree to which the allegedly infringing

product competes with the plaintiff's goods; (4) the alleged infringer's intent to confuse

the public; (5) the degree of care reasonably expected of potential customers (or the type

of product, its cost, and conditions of purchase); and (6) evidence of actual confusion.

*Sensient*, 613 F.3d at 763.  "These factors do not operate in a mathematically precise

formula; rather, [the court] use[s] them at a summary judgment stage as a guide to

determine whether a reasonable jury could find a likelihood of confusion." *Frosty*

*Treats*, 426 F.3d at 1008.  No one factor controls.  *Sensient*, 613 F.3d at 763.

### a.    Strength of Marks

"A strong and distinctive trademark is entitled to greater protection than a weak or

commonplace one." *Frosty Treats*, 426 F.3d at 1008.  A trademark's strength is

measured by both the mark's conceptual and commercial strength. *Lovely Skin*, *Inc.*, 745

F.3d at 888.  Plaintiff asserts that each of its asserted trademarks is suggestive and thus

inherently distinctive and entitled to protection.  As discussed above with respect to the

protectability of "Sleep Number" and "Number Bed," the Court considered the issues

surrounding the classification (and therefore, conceptual strength) of the "Sleep Number"

and "Number Bed" marks.  The Court concluded that appropriate classification of those

marks is for the jury to decide.  Similarly, the issue of the appropriate classification of the

remaining asserted marks for purposes of evaluating their conceptual strength will be

within the province of the jury.

A mark's commercial value, or marketplace recognition, also factors into the

strength of the mark analysis.  In the likelihood of confusion context, commercial

strength is based on the public recognition and renown of a mark as shown by the amount

of advertising, sales volume, features and reviews in publications, and survey

evidence.  *See Lovely Skin, Inc.*, 745 F.3d at 888.  Here, Plaintiffs have submitted

evidence demonstrating the commercial strength of its marks via continuous and

long-term commercial use and extensive advertising and marketing.  Because the jury

will determine the conceptual strength of the marks, the jury will have to consider that

strength along with the mark's commercial strength and determine how this factor weighs

in the likelihood of confusion analysis.

### b.    Similarity of the Marks

The second step considers the similarity between the mark and Defendants' use of

the marks and similar permutations.  *Frosty Treats,* 426 F.3d at 1008.  This analysis

should not be completed in a vacuum; rather, the Court "must attempt to recreate the

conditions in which buying decisions are made, and . . . what a reasonable purchaser in

market conditions would do."  *Calvin Klein Cosmetics Corp. v. Lenox Labs.,* 815 F.2d

500, 504 (8th Cir. 1987).

Here, there is significant evidence showing that Defendants use words and phrases

that are the same or nearly the same as Plaintiffs' asserted marks.  There is no dispute that

Defendants use "Sleep Number," "Select Comfort," "Comfortaire," and "Number Bed" in their advertising, sometimes with minor variations.  While the phrases themselves are not always identical to an asserted mark, the slight differences do not vary greatly from Plaintiffs' marks.  Therefore, this factor weighs in favor of a likelihood of confusion.

### c.      Competitive proximity

With respect to the third factor, the Court considers the degree of competition between the companies' products.  Confusion is more likely where the products are closely related.  *Sensient*, 613 F.3d at 766.  Plaintiffs and Defendants both market and sell adjustable air mattresses via overlapping commercial channels, in particular, internet-based sales.  However, there is also evidence in the record demonstrating that while nearly all of Defendants' sales occur on-line, the majority of Select Comfort's sales occur in physical stores.  In addition, there is evidence of dissimilarities between the parties' channels of advertising.  Because of these factual issues, it will be up to the jury to weigh the evidence and determine whether the factor of competitive proximity weighs in favor or against a finding of infringement.

### d.      Intent

The fourth factor analyzes whether the alleged infringer intended to pass off its goods as the trademark owner's goods.  *Id.* at 766.  Although proof of misleading intent is not required for success in an infringement claim, "the absence of such intent is a factor to be considered."  *Id.*

Plaintiffs assert that there is voluminous and clear evidence of Defendants' intent to confuse.  First, Plaintiffs point to evidence that they assert demonstrates that Baxter

specifically articulated an intent to infringe and that Stenzel and Baxter discussed the creation of "Tricky Marketing."  Plaintiffs also point to the numerous examples of grammatically awkward advertisements, such as "Number Bed Sleep Sale 60%" and "Sleep Sale 55% Off Number Bed," as evidence that Defendants intended to confuse consumers as to the affiliation of the brands.

Defendants dispute Plaintiffs' evidence of intent.  For example, Defendants assert that certain testimony that Plaintiffs rely on was taken out of context.  Defendants also submit that the challenged on-line advertisements are clearly labeled as "ads," are set apart from the organic search results in another part of the screen, and specifically display Defendants' websites below each ad.  Defendants maintain that the ads contain comparative language and invite comparison shopping, which is permitted by the Lanham Act.  Finally, Defendants argue that the awkward wording of their ads does not show an intent to confuse, but rather conforms to Google's AdWords Program.

The Court concludes that there are fact issues with respect to the issue of intent.  It will be up to a jury to weigh the evidence and determine whether the issue of intent weighs in favor or against a finding of infringement.

### e.      Type of Product at Issue

In evaluating this factor, the Court considers the type of products at issue, the costs and conditions of purchase, and the degree of care that consumers are expected to exercise.  *Id.* at 768.  "In considering this factor, we must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."  *Id.*

(quotation omitted).  Where the products have a high price point, consumers are likely to exercise a greater degree of care in making purchases, thereby reducing the likelihood of confusion.  *See Lovely Skin, Inc.*, 745 F.3d at 889.

As discussed above with respect to the discussion of initial interest confusion, the Court finds that this factor reduces the likelihood of confusion.

###### f.      Evidence of Actual Confusion

Evidence of actual confusion may be presented in the form of testimony about incidents of confusion or survey evidence.  *See Frosty Treats,* 426 F.3d at 1009.

Here, Plaintiffs contend that the record is replete with evidence of actual confusion, which includes Defendants' admissions of actual confusion, customer communications demonstrating actual confusion, and consumer survey evidence demonstrating customer confusion.  Some specific examples include:  (1) internal communications discussing customers who were confused; (2) customer communications expressing confusion over whether Defendants sell "Sleep Number" or "Comfortaire" products; and (3) surveys that Plaintiffs contend show high levels of confusion.  With respect to the survey evidence, Plaintiffs rely on the Poret Survey, which shows that 23-35% of customers are confused as to the source of the use of "Number Bed" and "Comfort Air" in Defendants' ads.  (Poret Survey at 35.)

Defendants take issue with Plaintiffs' evidence of actual confusion.  First, Defendants contend that the vast majority of instances where consumers are confused involve post-sale communications.  After accounting for the examples of post-sale confusion, Defendants contend that Plaintiffs have only a "handful" of examples of what

could be point-of-sale confusion.  Second, Defendants assert that Poret's likelihood of

confusion survey is flawed in a manner that greatly exaggerates that likelihood.

Specifically, Defendants argue that the question in Poret's survey that produces the "vast

majority" of positive responses did not test for *source* confusion.  Without this allegedly

faulty question, Defendants submit that Poret's survey showed very low net confusion

rates.  In addition, Defendants submit survey evidence that they contend demonstrates

only 1.5% confusion regarding the source or affiliation of Defendants' ads.  (Zochert Aff.

¶ 19, Ex. 19 ("Fong Survey").)

Because of the conflicting evidence, the Court concludes that a jury will have to

weigh the evidence of actual confusion and related survey evidence to determine whether

this factor weighs in favor or against a likelihood of confusion.

### g.      Weighing All Factors

In sum, there remain numerous material factual disputes relevant to the analysis of

likelihood of confusion so as to require that the issue be submitted to a jury.  While a

likelihood of customer confusion could be the conclusion reached by a reasonable jury,

that conclusion is not foregone.  Therefore, neither Plaintiffs nor Defendants are entitled

to summary judgment on Plaintiffs' trademark infringement claim.

## V.      False Advertising

In Count IV, Plaintiffs assert a claim for false advertising.  Plaintiffs assert that

they are entitled to summary judgment on certain elements of their false advertising

claim:  falsity, use in commerce, and materiality.  In particular, Plaintiffs assert that they

have demonstrated, as a matter of law, that certain of Defendants' advertisements were

"literally false," that some customers purchased beds from Defendants after hearing false statements, and that the statements factored into customers' decisions to buy Defendants' products.  Defendants oppose Plaintiffs' motion, and the Dires Defendants move separately on this claim.  The Dires Defendants argue that Plaintiffs have failed to establish standing to bring a false advertising claim, and even if they did establish standing, the false advertising claims fail as a matter of law.

As a threshold matter, the Court concludes that Plaintiffs have standing to assert this claim.  In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the Supreme Court resolved a circuit split on the issue as to what is required for a plaintiff to have standing to sue for false advertising under the Lanham Act and held that a plaintiff must:  (1) be within the "zone of interest" protected by the statute; and (2) show "proximate causation" between the plaintiff's injury and the alleged violation. *Id*. at 1390.  In the false advertising context, a plaintiff must allege an injury to a "commercial interest in reputation or sales."  *Id*.  Here, Plaintiffs have submitted evidence that Defendants have made false statements to customers while comparing their products to Plaintiffs' products.  Plaintiffs have also pointed to evidence that they contend shows that customers have purchased products from Defendants after hearing these false statements.  The Court therefore holds that the harm alleged by Plaintiffs has a sufficiently close connection to the asserted false advertising to confer standing on Plaintiffs.

To establish a claim for false advertising, a plaintiff must establish the following: (1) a false statement of fact in a commercial advertisement about its own or another's

product; (2) the statement actually deceived or has the tendency to deceive a substantial

segment of its audience; (3) the deception is material (likely to influence the purchasing

decision); (4) the defendant caused its false statement to enter interstate commerce; and

(5) the plaintiff has been, or is likely to be, injured as a result of the advertising. *United*

*Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998); 15 U.S.C.

§ 1125(a)(1)(B) (prohibiting false statements in "commercial advertising and

promotion").

> The false statement necessary to establish a Lanham Act violation generally falls

into one of two categories:  (1) commercial claims that are literally false as a factual

matter; and (2) claims that may be literally true or ambiguous but which implicitly

convey a false impression, are misleading in context, or likely to deceive consumers.

*United Indus. Corp.*, 140 F.3d at 1180.  Claims might also fall into a third category,

generally known as "puffery," which is "exaggerated advertising, blustering, and

boasting upon which no reasonable buyer would rely and is not actionable." *Id.* (citation

omitted).  "Nonactionable puffery includes representations of product superiority that are

vague or highly subjective." *Id.*  However, false descriptions of specific or absolute

characteristics of a product and specific, measurable claims of product superiority based

on product testing are not puffery and are actionable. *See id.*

> Plaintiffs point to evidence that when consumers visit Defendants' Personal

Comfort website, call Defendants' phone number, or engage in a "live chat," Defendants

have made numerous false statements.  These statements include:  "Personal Comfort is

'Preferred 6 to 1' over Sleep Number"; "Personal Comfort designed Sleep Number's

M-Series beds"; "Personal Comfort is FDA regulated"; "Personal Comfort offers FDA registered mattresses"; "Personal Comfort Bed has been making mattresses since the 1970s"; "In the 1990s Personal Comfort sold patents to Sleep Number and had a non-compete with them"; "Personal Comfort has been around for 12 years longer than Sleep Number"; "Personal Comfort beds are 'identical' to Sleep Number beds"; "Personal comfort is the only mattress in the industry with touch screen technology"; "The air chambers on Sleep Number beds are not replaceable"; "The foam on Sleep Number beds is not replaceable"; "The foam used in Personal Comfort beds is 'medical grade'"; "The air chambers used in Personal Comfort beds are 'medical grade.'" (*See generally* Doc. No. 235 at 8-9 and related citations.)

In their very brief analysis of their false advertising claim, Plaintiffs attempt to establish falsity as a matter of law based on excerpts of testimony of various witnesses regarding the truthfulness of certain statements. Defendants, however, contest the factual basis for the alleged falsity of some of the contested statements and, as to the remaining statements, submit that they are not literally false when explained in a broader context. Moreover, Defendants move separately on several asserted statements that they contend do not constitute commercial advertising or are puffery.

Here, there are numerous factual issues that preclude summary judgment for either party on Plaintiffs' false advertising claims. Instead, these factual issues must be resolved by a jury as to the elements of Plaintiffs' false advertising claim, and in particular with respect to the falsity element of the claim. Therefore, summary judgment is inappropriate.

## VI.    Trademark Dilution

In Count III, Plaintiffs assert a claim for trademark dilution.  Defendants move for summary judgment on this claim on the grounds that the marks are not famous as a matter of law.  Plaintiffs have since indicated that they do not intend to pursue dilution claims with respect to the "Select Comfort" and "Comfortaire" marks.  Instead, Plaintiffs' dilution claim pertains only to the Sleep Number marks ("Sleep Number" and "What's Your Sleep Number?").  As to these marks, Plaintiffs claim that fact issues preclude summary judgment on their dilution claims.

To prevail on a dilution claim, a trademark owner must demonstrate that the use of a trademark is likely to cause dilution by blurring or by tarnishing a famous mark, regardless of the presence or absence of actual likely confusion, of competition, or of actual economic injury.  15 U.S.C. § 1125(c).  "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of the source of the goods or services of the mark's owner."  *Id.* § 1125(c)(2)(A).

The judicial consensus is that "famous" is a rigorous standard.  *Everest Capital Ltd. v. Everest Funds Mgmt., LLC*, 393 F.3d 755, 763 (8th Cir. 2005).  "Dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge their value."  *Id.* (citing *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 875 (9th Cir. 1999).)  Courts may consider eight non-exclusive factors in determining whether a mark is famous, including:  (1) duration, extent, and geographical reach of advertising and publicity; (2) amount, volume, and geographical extent of sales; (3) extent of actual

recognition; and (4) registration on the principal register.  *See McCarthy on Trademarks* § 24:106.

Plaintiff has submitted the following evidence in support of its dilution claim. First, Plaintiffs submit that they have spent over $150 million in 2014 and over $1 billion since 2010 in marketing, advertising, and promoting their Sleep Number products. (Somers Aff. ¶ 5.)  These efforts include advertising in many mediums, including online advertisements, radio and television spots, newspaper and magazine advertisements, and direct mail.  (*Id*. ¶ 6 & Ex. 1.)  In addition, Plaintiffs submit evidence of heavy publicity of the "Sleep Number" brand, including rankings in industry magazines, positive reviews in Consumer Reports, celebrity endorsements, and numerous mentions in magazines, newspapers, online, television programs, and comics.  (*Id*. ¶ 9 & Exs. 3-4.)  In addition, Plaintiffs submit evidence of numerous pop-culture references about "Sleep Number" beds.  (*Id*. ¶ 9 & Ex. 4.)  Plaintiffs assert that they have achieved over $10 billion in sales since 2010.  (*Id*. ¶ 5.)  Plaintiffs also submit survey evidence that they assert demonstrates fame, and in particular that in 2012, "Sleep Number" achieved 21% unaided brand awareness and 75% total awareness.  (Hansen Aff. ¶ 112,  Ex. 109.)

Defendants dispute that Plaintiffs' Sleep Number marks are famous, focusing primarily on Plaintiffs' survey evidence.  Defendants submit that in order to qualify as famous, a survey should reveal brand recognition in the range of 75%.  Defendants also contend that the survey reveals that brand awareness for the "Sleep Number" mark achieved under 20% awareness from 2001 to 2011, and reached a high point of 21% in 2012.  Defendants also argue that in the face of undisputed direct evidence that the

36

*unaided* recognition of the "Sleep Number" mark hovered around 12-13% from 2007-2009, indirect evidence of famousness does not create a fact issue as to the marks' famousness.

The Court concludes that there are material fact issues that preclude summary judgment on Plaintiffs' dilution claim. While the parties dispute the relevance of the various items of survey evidence, and whether the awareness of the "Sleep Number" mark is high enough to demonstrate famousness, the jury must weigh the competing evidence, including the indirect evidence that could support the marks' fame, and determine if the marks are famous. Therefore, Plaintiffs' trademark dilution claim will be resolved at trial.

## VII.   Unjust Enrichment

In Count IX, Plaintiffs assert a claim for unjust enrichment. To prevail on a claim of unjust enrichment, a plaintiff must show that a defendant knowingly received something of value that it was not entitled to, and that it would be unjust for the defendant to keep those benefits. *Guinness Import Co. v. Mark VII Distribs., Inc*., 153 F.3d 607, 613 (8th Cir. 1998). However, unjust enrichment is an equitable remedy, and "[a] party may not have equitable relief where there is an adequate remedy at law available." *United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013) (citing *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996)).

Here, Defendants argue summarily that Plaintiffs may not seek equitable relief because there is an adequate remedy at law under the Lanham Act. Plaintiffs contend that their unjust enrichment claim is not duplicative of a Lanham Act claim, but offer no

further explanation as to why their unjust enrichment claim is not duplicative of other claims. Because it appears that Plaintiffs have an adequate remedy at law, the Court grants Defendants' motion for summary judgment as to Plaintiffs' unjust enrichment claim.

## VIII.   Minnesota Deceptive Trade Practices Act ("MDTPA")

Defendants assert that Plaintiffs' MDTPA claim is coextensive with the Lanham Act claims for trademark infringement, unfair competition, and false advertising. Plaintiffs assert that the claims under the Lanham Act and MDTPA are not wholly coextensive and that the MDTPA provides a more liberal standard for awarding attorney fees than the Lanham Act. Plaintiffs therefore assert that the MDTPA claim may lie separately for the purpose of calculating damages. The Court agrees with Plaintiffs. Therefore, summary judgment is not appropriate on this claim.

## IX.   Counterclaim II

In Counterclaim II, Defendants seek a declaration that the purchase of Plaintiffs' trademarks as keywords does not infringe Plaintiffs' trademark rights. Baxter moves for summary judgment on this claim, arguing that Plaintiffs have acknowledged that the purchase of competitive trademarks as keywords by itself does not constitute infringement or unfair competition. Baxter points out that Plaintiffs themselves purchase competitive trademarks as keywords. Baxter asserts, therefore, that they are entitled to summary judgment on this declaratory request. Plaintiffs counter that there is no actual controversy on this issue because they have never contended that Defendants' mere purchase of competitor trademarks is wrongful. What Plaintiffs do contend is that

Defendants' purchase of the keywords in conjunction with the resulting advertisements is wrongful.

The Court agrees that there is no controversy as Plaintiffs do not claim that the purchase of competitor trademarks as keywords alone is wrongful. Thus, Plaintiffs are entitled to summary judgment on Counterclaim II.

## X.   Unclean Hands

Defendants assert a defense of unclean hands. In particular, Defendants submit that Plaintiffs have purchased its competitors' keywords while suing Defendants for the same. Defendants assert that given the fact that Plaintiffs allege that Defendants' purchase of Plaintiffs' keywords was wrongful, Defendants are entitled to assert an unclean hands defense based on Plaintiffs' same conduct. As explained above, Plaintiffs do not claim keyword purchasing alone is wrongful. Thus, there is no basis for Defendants' unclean hands defense on these grounds. Therefore, Plaintiffs' motion for summary judgment on Defendants' unclean hands defense is granted to the extent that it is based on Plaintiffs' alleged purchase of competitors' keywords.

However, Defendants also base their unclean hands defense on the allegation that Plaintiffs have engaged in advertising that is similar to some of Defendants' advertising that Plaintiffs allege constitutes false advertising. To the extent that Defendants' unclean hands defense is based on such advertising, the Court denies Plaintiffs' motion.

## XI.   Individual & Successor Liability

Plaintiffs seek to hold Baxter, Stenzel, and Miller personally liable for Direct Commerce's, DCA's, and Dires' conduct based on their participation in wrongful

conduct.  Defendants move for summary judgment, arguing that there is no basis for individual liability here.

Natural persons may be liable for trademark infringement.  *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1046 (D. Minn. 2015) (citation omitted).  "A corporate officer is personally liable for the corporation's trademark infringement if the officer participates in that infringement."  *Id.* (citing *Microsoft Corp. v. Ion Techs. Corp.*, Civ. No. 01-1769, 2003 WL 21356084, at *5 (D. Minn. May 30, 2003)).  In *Zerorez*, the Court found the corporate defendant's owner/manager personally liable for trademark infringement where there was evidence that she had written the Google AdWords content and actively participated in the infringement by managing the advertising budget.  *Id*.

Plaintiffs point to evidence that Miller manages Dires' marketing and advertising budget, and after the initiation of the lawsuit, has reviewed advertising for approval.  At Dires, Stenzel has participated in and had responsibility for certain forms of advertising and since March 2013, has been primarily in charge of the Personal Comfort website and advertising.  Stenzel also consults with Miller regarding Dires' marketing and advertising budget.  Also at Dires, Baxter designed the Personal Comfort website, developed advertising, and trained salepersons.

The Court concludes that there is sufficient evidence to submit the issue of individual liability to the jury.  There are genuine issues of fact as to these individuals' involvement in the allegedly infringing activities and, therefore, whether they can be held

personally liable.  However, the Court grants Defendants' summary judgment as to Plaintiffs' claim of successor liability because Plaintiffs did not plead such a claim.

### ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiffs' Motion for Partial Summary Judgment (Doc. No. [233]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.    Plaintiffs are entitled to summary judgment on Counterclaim II.

b.    Plaintiffs are entitled to summary judgment on Defendants' unclean hands defense to the extent that it is based on Plaintiffs' alleged purchase of competitors' keywords.

c.    Plaintiffs' motion is denied in all other respects.

2.    Dires Defendants Motion for Summary Judgment (Doc. No. [221]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.    Dires Defendants are entitled to summary judgment on Plaintiff's unjust enrichment claim (Count IX).

b.    Dires Defendants are entitled to summary judgment on Plaintiffs' claim of successor liability.

c.    Dires Defendants' motion is denied in all other respects.

3.    Baxter's Motion for Summary Judgment (Doc. No. [226]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.      Baxter is entitled to summary judgment on Plaintiff's unjust enrichment claim (Count IX).

      b.      Baxter is entitled to summary judgment on Plaintiffs' claim of successor liability.

      c.      Baxter's motion is denied in all other respects.

Dated:  January 13, 2016               s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge