# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Select Comfort Corporation and Select Comfort SC Corporation,<br><br>          Plaintiffs, | Civil No. 12-2899 (DWF/SER) |
| v. | **MEMORANDUM<br>OPINION AND ORDER** |
| John Baxter; Dires, LLC d/b/a Personal Touch Beds and Personal Comfort Beds; Digi Craft Agency, LLC; Direct Commerce, LLC d/b/a Personal Touch Beds; Scott Stenzel; and Craig Miller,<br><br>          Defendants. | |

---

Andrew S. Hansen, Esq., Cynthia S. Topel, Esq., Dennis E. Hansen, Esq., Elizabeth A. Patton, Esq., and Samuel R. Hellfeld, Esq., Fox Rothschild LLP, counsel for Plaintiffs.

Barbara P. Berens, Esq., Carrie L. Zochert, Esq., and Erin K. Fogarty Lisle, Esq., Berens & Miller, PA, counsel for Defendant John Baxter.

David T. Schultz, Esq., Joseph P. Ceronsky, Esq., and Michael C. McCarthy, Esq., Maslon LLP, counsel for Defendants Dires, LLC, d/b/a Personal Touch Beds and Personal Comfort Beds, Scott Stenzel, and Craig Miller.

Defendant Digi Craft Agency, LLC, *pro se*.

Defendant Direct Commerce, LLC, d/b/a Personal Touch Beds, *pro se*.

---

## INTRODUCTION

This matter is before the Court on a Motion to Exclude Testimony of Plaintiffs' Expert, Sarah Butler ("Butler") brought by Defendants John Baxter ("Baxter"), Dires,

LLC ("Dires" or "Personal Comfort"), Craig Miller ("Miller"), and Scott Stenzel

("Stenzel") (together, "Dires Defendants") (Doc. No. 277); Dires Defendants' Motion to

Exclude in Part Testimony of Plaintiffs' Expert, Hal Poret ("Poret") (Doc. No. 280);

Dires Defendants' Motion to Exclude Testimony of Plaintiffs' Expert, Theodore Davis

("Davis") (Doc. No. 283); Dires Defendants' Motion to Exclude Expert Testimony of

Renee Marino ("Marino") (Doc. No. 287); and Plaintiff Select Comfort Corporation's

("Select Comfort") and Select Comfort SC Corporation's ("Comfortaire") (together,

"Plaintiffs") Motion to Exclude Report and Opinions of Uli Widmaier ("Widmaier")

(Doc. No. 291).  In addition, Plaintiffs have filed a Motion for Reconsideration (Doc.

No. 325) of the Court's Memorandum Opinion and Order (Doc. No. 270), which the

Court considers as well.

## BACKGROUND

In a Memorandum Opinion and Order dated January 13, 2016, the Court granted

in part and denied in part the parties' cross-motions for summary judgment.  (Doc.

No. 270 (the "Summary Judgment Order").)  Now before the Court are a series of

*Daubert* motions and a motion to reconsider a portion of the Summary Judgment Order.

To provide context for the pending motions, the Court briefly outlines the facts of this

case.

Plaintiffs design, manufacture, and market adjustable air beds[1] and related products.  (Doc. No. 239 ("Somers Aff.") ¶¶ 2, 3.)  Select Comfort markets its products under the "Sleep Number" brand.  (*Id.* ¶ 3.)  Select Comfort is the leading manufacturer of adjustable air beds.  (Doc. No. 224 ("McCarthy Decl.") ¶ 2, Ex. A ("Marino Report") ¶ 15.)  Select Comfort owns registered trademarks for "Sleep Number," "Select Comfort," and "What's Your Sleep Number."  (Doc. No. 53 (Second Amend. Compl. ("SAC")) ¶¶ 14-16, Exs. A-C.)  Comfortaire also markets and sells adjustable air beds, marketed under the "Comfortaire" mark.  (Doc. No. 237 ("Karr Aff.") ¶ 2.)  Comfortaire is the second largest seller of adjustable air beds.  (*Id.*)  Comfortaire owns the registered trademark for "Comfortaire."  (SAC ¶ 17, Ex. D.)

Defendants market and sell beds online and over the phone.  None of the Defendants have been authorized retailers, distributors, or sellers of Sleep Number or Comfortaire.  (Somers Aff. ¶ 4; Karr Aff. ¶ 3.)  On November 16, 2012, Select Comfort sued Dires and Baxter.  (Doc. No. 1.)  On November 8, 2013, Select Comfort filed a Second Amended Complaint adding Comfortaire as a plaintiff and Miller, Stenzel, Direct Commerce, LLC ("Direct Commerce"), and Digi Craft Agency ("DCA") as defendants.  (Doc. No. 53 ("SAC".)[2]  At the time of the summary judgment motion, the following causes of action remained:  (1) Federal Trademark Infringement (Count I); (2) Federal

---

[1]    An adjustable air bed is one that may be made firmer or less firm by changing the number on a remote control.

[2]    Direct Commerce and DCA did not answer the Second Amended Complaint and are in default.  (Doc. No. 82.)

Unfair Competition (Count II); (3) Federal Dilution of Trademark (Count III); (4) False Advertising (Count IV); (5) Deceptive Trade Practices (Count V); and (6) Unjust Enrichment (Count IX).[3]  (SAC.)

Defendants deny any unlawful or actionable conduct and assert three counterclaims.  In Counterclaim I, Defendants seek a declaration that the phrase "Number Bed" is descriptive and is incapable of acquiring secondary meaning or functioning as a trademark.  (Doc. No. 60, Countercl. ¶¶ 9-19.)  In Counterclaim II, Defendants seek a declaration that the use of "Select Comfort," "Sleep Number," and "Comfortaire" as keywords does not infringe Plaintiffs' trademark rights.  (*Id*. ¶¶ 20-27.)  In Counterclaim III, Defendants seek to cancel two of Select Comfort's trademark registrations because the phrase "Sleep Number" is generic.  (*Id*. ¶¶ 28-48.)

In the Summary Judgment Order, the Court granted in part and denied in part the parties' cross-motions for summary judgment.  In sum, the Court concluded that Plaintiffs were entitled to summary judgment on:  Counterclaim II (Federal Unfair Competition) and Defendants' unclean hands defense to the extent that these were based on Plaintiffs' alleged purchase of competitors' keywords.  As to the Dires Defendants' and the Baxter Defendants' motions, the Court held that Defendants are entitled to summary judgment on Plaintiffs' claim of unjust enrichment (Count IX) and Plaintiffs' claim of successor liability.  Further, with respect to Plaintiffs' claim for trademark

---

[3]     Plaintiffs originally asserted ten causes of action, but four were dismissed upon the stipulation of the parties and the Court's order.  (Doc. No. 135.)

infringement, the Court concluded that this is not an appropriate case for the application of the initial interest confusion doctrine, and that Plaintiffs will have to establish a likelihood of confusion at the time of purchase.  (Summary Judgment Order at 25-26.) Finally, with respect to the parties' arguments on the protectability of the relevant trademarks, the Court, among other things, concluded that there were significant and material factual issues on the appropriate classification of the "Sleep Number" mark, and that the jury would be tasked with resolving whether "Sleep Number" is generic. (Summary Judgment Order at 19.)

## DISCUSSION

### I.   Motion to Reconsider

The Court first addresses Plaintiff's motion for reconsideration, which focuses on Defendants' Counterclaim for Cancellation of the "Sleep Number" mark based on genericness.  In short, Plaintiffs argue that Defendants' Counterclaim for Cancellation must be dismissed because Defendants have withdrawn the only theory of genericness that they pleaded (the abandonment theory) and that Defendants should not be permitted to pursue the claim that "Sleep Number" was generic *ab initio* because it was neither pleaded nor advanced until after the close of discovery.

"A mark is generic *ab initio* if it is generic at the time the company adopted it as a trademark."  *Pods Enters., Inc. v. U-Haul Int'l, Inc.*, Civ. No. 12-1479, 2015 WL 1097374, at *2 (M.D. Fla. Mar. 11, 2015).  Terms can also become generic through common usage, and "[a] registered mark is deemed abandoned . . . when an owner causes the mark to 'lose its significance as a mark.'"  *Cmty. of Christ Copyright Corp. v. Devon*

*Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011) (citation omitted).   In this action, Defendants contend that they originally sought cancellation based on both arguments—first, because the mark is generic *ab initio*, and second because Plaintiff abandoned the mark through its own conduct causing the mark to become generic over time.  (Doc. No. 60 ¶¶ 28-49.)

Upon close review of the parties' pleadings and submissions to the Court, however, it is apparent that the only claim of genericness sufficiently alleged in Defendants' counterclaim for cancellation is that Plaintiffs abandoned the mark "Sleep Number."  In their first counterclaim pleading, Defendants asserted in a conclusory fashion that the "Sleep Number" mark is generic.  (Doc. No. 1, Countercl. ¶¶ 21-25.) Plaintiffs moved to dismiss the counterclaim, and Defendants amended their pleading, setting forth additional allegations in support, namely that the phrase "Sleep Number" had been "abandoned by Select Comfort through its own course of conduct causing the mark to become generic."  (Doc. No. 25, Countercl. ¶ 28; Doc. No. 60, Countercl. ¶ 31; *see also* Doc. No. 25, Countercl. ¶¶ 25-45; Doc. No. 60 Countercl. ¶¶ 28-48).  For example, Defendants allege:

> 30.    The phrase "sleep number" when used in connection with Select Comfort's adjustable air bed mattress products is generic.
>
> 31.    The phrase "sleep number" when used in connection with Select Comfort's adjustable air bed mattress products has been abandoned by Select Comfort through its own course of conduct causing the mark to become generic and otherwise lose its significance as a mark.

(Doc No. 60, Countercl. ¶¶ 30, 31.)  Defendants then go on to allege instances in which Plaintiffs have used "Sleep Number" in allegedly generic ways, such as by describing

6

"Sleep Number" as a feature of its product in marketing campaigns, through communications with consumers, investor relations materials, and in bed assembly instructions.  (*Id.* ¶¶ 32-40.)  Defendants further allege that, based on this use, the purchasing public understands "Sleep Number" to be generic, evidenced by third-party use, such as bloggers and customers.  (*Id.* ¶¶ 40-43.)  However, Defendants do not specifically allege that the "Sleep Number" mark was generic *ab initio*.  Nor do they allege facts that would support such a claim.

In addition, the record suggests that throughout the discovery period, Defendants continued to assert genericness based on abandonment.  Indeed, Plaintiffs' interrogatories asked Defendants to identify the basis for their cancellation counterclaim and, notably, they did not identify an *ab initio* claim.  (*See* Doc. No. 294 ("Patton Aff.") ¶¶ 6-12, Exs. 5-11 (Dires Ans. Interrogs. 21-23, 25; Stenzel Ans. Interrogs. 21-23, 25; Miller Ans. Interrogs. 19-21, 23).)  Moreover, Plaintiffs have cited to deposition testimony wherein Defendants claimed that the "Sleep Number" mark had evolved over time to become widely known.  (*See* Doc. No. 328 ¶ 10, Ex. 9 at 36-38 ("That I used to think that [Sleep Number] was a brand.  But over time, it has evolved to become widely known as simply a setting.  A comfort setting."); s*ee also* Doc. No. 327 at 3-4, n.9, 10.)  Plaintiffs have pointed to other portions of the record relevant to discovery showing that Defendants pursued only an abandonment claim in any meaningful way.  (*See, e.g.*, Doc. No. 65; Doc. No. 84.)  And in January 2014, the Court concluded that July 2010 forward was the relevant date range for certain document requests after Defendants requested documents dating back to 2007.  (Doc. No. 89 at 2.)  The document requests sought information on

the use of "Sleep Number" and phrases incorporating "Sleep Number," including use in advertising and internal communications.  Thus, these requests would not have related to an *ab initio* claim.

In the Summary Judgment Order, the Court considered Plaintiffs' motion for summary judgment on the cancellation counterclaim and concluded that the jury would be tasked with resolving whether the "Sleep Number" mark is generic.  In so concluding, the Court pointed to the evidence submitted by Defendant which, upon closer examination, relates to its abandonment theory:

> Defendants contend that Select Comfort has used "Sleep Number" generically for years, pointing to evidence that Select Comfort introduced the phrase "Sleep Number" as a desirable product feature, and has spent more than fourteen years and millions of dollars to educate the buying public about what a sleep number is, how someone determines his or her sleep number, and why the public should purchase a bed with a sleep number feature.  Defendants submit that Plaintiffs used and advertised the term "Sleep Number" as a numerical firmness setting for years and, not until 2008, did Select Comfort begin using it as a brand (by adding the word "setting," "bed," or "store" to modify "sleep number").  Defendants also submit that a survey commissioned by Select Comfort in June 2012 establishes the genericness of the "Sleep Number" mark.  In addition, Defendants point to evidence that Select Comfort used the mark generically in public filings and marketing campaigns by, for example, describing the sleep number feature as a firmness setting and feature.  Further, Defendants submit evidence that the public uses "Sleep Number" generically.

(Summary Judgment Order at 17 (citations omitted).)  In a footnote, the Court noted, without discussion, that Defendants acknowledged that they have asserted alternative theories in support of their counterclaim, but "maintain that Sleep Number is generic *ab initio*." (*Id*. at 16, n.6.)  However, the Summary Judgment Order does not reach the merits of the *ab initio* claim, and considering that there were fact issues precluding

summary judgment on the cancellation counterclaim (and in substance, Defendants' abandonment theory), the issue of *ab initio* genericness was not meaningfully addressed.

After discovery closed, Defendants indicated that they would pursue a generic *ab initio* claim.  And Defendants now submit that they are withdrawing their abandonment claim.  However, the Court finds that Defendants' assertion of their *ab initio* claim is untimely and improper.   Defendants did not properly plead an *ab initio* claim, and such a claim was never subject to meaningful discovery.   It is apparent that Defendants pursued, and the parties focused discovery on, an abandonment claim.

Defendants claim that Plaintiffs were put on notice of an *ab initio* claim, in particular at a May 2015 discovery hearing.  (Doc. No. 275 at 25.)  At that hearing, the Magistrate Judge considered various discovery motions, including a motion for a protective order on third-party discovery (subpoenas served by Defendants on various advertising agencies and billboard companies engaged by Plaintiffs dating back to 2000). (*Id*. at 14-15.)   Plaintiffs argued that discovery of materials pre-dating July 2010 was not relevant.  (*Id*. at 18-21.)  Defendants did state that the theory of their defense had "in some measure" changed since January 2014 and that their legal theory was that "Sleep Number" came into the public domain as a generic term, making the pre-2010 documents relevant.  (*Id*. at 25, 27.)   The Court ultimately granted the third-parties' motion for a protective order with respect to the temporal scope of the subpoenas.  (*Id*. at 69.)  The Court did not, however, analyze Defendants' relevance arguments as to the purported change of defense theory.  The Court now concludes that this exchange was insufficient to place Plaintiffs on notice that Defendants intended to alter the basis for their

cancellation claim.  Up until this point, the parties were operating under the understanding that Defendants' claim of genericness was based on abandonment. Because this exchange occurred so close to the end of discovery and expert deadlines, it operated to prevent meaningful discovery on an *ab initio* claim.[4]  The Court concludes that it would be manifestly unfair to allow Defendants to pursue the *ab initio* claim at trial.

In light of the fact that Defendants have withdrawn their abandonment claim, and because the Court will not allow Defendants to pursue an *ab initio* claim, Defendants no longer can state a claim for cancellation of "Sleep Number."  Therefore, the Court dismisses Defendants' Counterclaim III with prejudice.

## II.  *Daubert* Motions

### A.  Legal Standard

Before accepting the testimony of an expert witness, the trial court is charged with the "gatekeeper" function of determining whether an opinion is both relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 820 (D. Minn. 2011). Under Federal Rule of Evidence 702, which governs the admission of expert testimony, an expert may testify if:  (1) the expert's scientific, technical, or other specialized

---

[4]     At the discovery hearing, Defendants noted that their expert's opinion was due in six days.  (Doc. No. 275 at 27; *see also* Doc. No. 124 (setting a May 20, 2015 deadline for Defendants' disclosure of the identity of expert witnesses).)  The Court also notes that at this point, Plaintiffs' deadline for expert reports had already passed.  (*See* Doc. No. 124.)

knowledge will help the fact-finder to understand the evidence or determine a fact in

issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the

product of reliable principles and methods; and (4) the expert has reliably applied those

principles and methods to the facts of the case.  Fed. R. Evid. 702; *see also Lauzon v.*

*Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

The Court also notes that "Rule 702 reflects an attempt to liberalize the rules

governing the admission of expert testimony," and it favors admissibility over exclusion.

*Lauzon*, 270 F.3d at 686.  When examining an expert opinion, a court applies a general

rule that "the factual basis of an expert opinion goes to the credibility of the testimony,

not the admissibility, and it is up to the opposing party to examine the factual basis for

the opinion in cross-examination."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th

Cir. 2001) (citation and quotation omitted).  "[I]f the expert's opinion is so fundamentally

unsupported that it can offer no assistance to the jury," then it must be excluded.  *Id.*

at 30.  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), the Supreme Court

concluded that "the trial judge must have considerable leeway in deciding in a particular

case how to go about determining whether particular expert testimony is reliable."  The

proponent of the evidence has the burden of establishing by a preponderance of the

evidence that testimony is admissible.  *Lauzon*, 270 F.3d at 686.

### B.     Renee Marino—Plaintiffs' Damages Expert

Under the Lanham Act, any award of damages must serve as compensation, not a

penalty.  15 U.S.C. §1117(a) (in a successful claim under the Lanham Act, "the plaintiff

shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits,

(2) any damages sustained by the plaintiff, and (3) the costs of the action. . . " and the award "shall constitute compensation and not a penalty").  To recover money damages, a plaintiff "must prove both actual damages and a causal link between defendant's violation and those damages." *Aviva Sports, Inc.*, 829 F. Supp. 2d at 815 (citation omitted).  Disgorgement of profits might also be available under the Lanham Act, subject to the principles of equity.  *See* 15 U.S.C. § 1117(a).  "Disgorgement exists to deter would-be infringers and to safeguard against unjust enrichment." *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 473 (8th Cir. 2011).  Disgorgement of profits for violation of the Lanham Act can be based on unjust enrichment, as a measure of plaintiff's damages, or as deterrence for willful behavior.  *See id.* at 474.  To recover disgorgement profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a); *see also Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, Civ. No. 13-2326, 2016 WL 2637801, at *6 (D. Minn. May 6, 2016).

Marino is a Certified Public Accountant ("CPA") who was retained by Plaintiffs to provide a damages opinion.[5]  (Marino Report at 2-3.)  Marino offers an estimate for the profits realized through Defendants' allegedly illegal use of Plaintiffs' trademark during the relevant time period, including advertising cost savings of at least $12,257,330.  (*Id.* ¶ 11.)

---

[5]      Defendants do not challenge Marino's credentials.

Defendants move to exclude Marino's report and testimony for three primary reasons.  First, Defendants argue that Plaintiffs' damages case turns on Plaintiffs' ability to prove trademark infringement based on initial interest confusion, as opposed to confusion at the time of purchase, and therefore that Marino's calculations are at odds with the Court's Summary Judgment Order.   Second, Defendants move to exclude Marino's opinion that Plaintiffs are entitled to "advertising cost savings of at least $12,257,330," arguing that such damages are not recoverable.  Third, Defendants contend that some portions of Marino's calculations are duplicative and based on "false assumptions."  The Court considers each argument in turn.

First, Defendants move to exclude Marino's report and testimony as being inconsistent with the law of this case.  In particular, Defendants point out that in the Summary Judgment Order, the Court concluded that in order for Plaintiffs to establish a likelihood of confusion, they would need to show a likelihood of confusion at the time of purchase.  (Summary Judgment Order at 24-26.)  Defendants point out that Marino's analysis rests on the percentage of allegedly infringing ads that were clicked on, multiplied by the average profit allegedly obtained from each website click.  Thus, Defendants argue that Marino's calculations are based on initial interest confusion and that Marino does not attempt to quantify alleged confusion at the time of sale.

Plaintiffs, however, contend that Marino's calculations do not depend on initial interest confusion.  Instead, Plaintiffs maintain that Marino's calculations begin with consumers' clicks on certain of Defendants' advertisements because Plaintiffs intend to prove that those advertisements are likely to cause confusion.  More precisely, Plaintiffs

13

argue that once the jury finds that Defendants' advertising infringes or constitutes false advertising, Plaintiffs have a right to demonstrate damages and, further, that Marino's calculations are tied to the impact of the false advertising. Plaintiffs also contend that Defendants wrongly presume that the Court, in rejecting the application of the initial interest confusion doctrine, also dismissed Plaintiffs' trademark infringement claims. Plaintiffs point out that the Court denied Defendants' motions for summary judgment on this claim and that the question of infringement is a question for the jury. (Summary Judgment Order at 30-31.)

The Court has reviewed the parties' positions and denies Defendants' motion on this issue. In its Summary Judgment Order, the Court held that this case is not appropriate for the application of the initial interest confusion doctrine. (*Id*. at 25.) However, the Court did not dismiss Plaintiffs' trademark infringement claims. Instead, the Court explained that in order to prevail on its trademark infringement claim, Plaintiffs will have to establish a likelihood of confusion at the time of purchase. (*Id*. at 26.) Therefore, while Plaintiffs cannot prevail on their infringement claim *solely* based on initial interest confusion, Plaintiffs can present that evidence to the jury in an effort to prove that the advertisements constitute infringement as point-of-sale confusion. Plaintiffs submit that Defendants engage in a series of deceptions and Lanham Act violations that go beyond initial interest confusion. For example, Plaintiffs argue that Defendants' salespersons were trained to make false claims such that even if initial interest confusion abated by the point of sale, Defendants' sales were tainted by false comparative advertising. Thus, any confusion caused by Defendants' advertising could

14

be relevant to damages.  *See, e.g.*, *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1041-45 (D. Minn. 2015) (relying on infringer's misleading pay-per-click advertisements in finding trademark infringement on summary judgment, even without recognizing the initial interest confusion doctrine).  And to the extent that Plaintiffs can demonstrate confusion extended to the point-of-sale unabated, they are entitled to put forth their damages calculations based on this evidence of infringement. Defendants can address their concerns with Marino's testimony on cross-examination and through the presentation of their own evidence.

Second, Defendants take issue with Marino's inclusion of Defendants' "advertising cost savings" as a category of recoverable damages under the Lanham Act. In particular, Defendants argue that "advertising cost savings" are not recoverable under the Lanham Act.  Defendants contend that it is legal to refer to Plaintiffs' products in their advertising such that Marino's calculation is based on the false premise that Defendants' advertisements infringe simply because they divert potential customers to Defendants' website.  The Court disagrees.  Disgorgement exists to deter would-be infringers and to avoid their unjust enrichment.  Thus, costs avoided by Defendants because of trademark infringement could be included in Defendants' profits.  *See, e.g.*, *First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1089 (D. Kan. 2000) (allowing recovery of saved costs).[6]  At this time, the Court will allow Marino's

---

[6]     Defendants cite to *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (2015), for the proposition that disgorgement, as an equitable remedy, considers actual, not hypothetical, gains.

testimony on "advertising cost savings," subject to proper foundation being laid. Defendants can challenge the weight of the testimony at trial. The Court also notes that the equitable component of Lanham Act damages will allow the Court to revisit arguments on appropriate damages calculations during or after trial.

Finally, the Court will address any concerns about the potential that Marino's lost profits model will be duplicative of the disgorgement model through its instructions to the jury. *See Wildlife Research Ctr., Inc. v. Robinson Outdoors, Inc.*, 409 F. Supp. 2d 1131, 1136 (D. Minn. 2005). And to the extent that Defendants assert that Marino's calculation on lost profits assumes that Plaintiffs would have made a sale to consumers who purchased from Defendants online, Defendants can challenge Marino's assumption on cross-examination.

For the above reasons, Defendants' motion to exclude the testimony of Marino is denied. Marino's testimony will be presumptively admissible assuming proper foundation is laid and subject to objections at trial.

### C.    Hal Poret—Plaintiffs' Consumer Survey Expert

Poret is a consumer survey expert whom Plaintiffs retained to conduct a survey to determine:

> [1] the extent to which, if at all, consumers are misled into mistakenly believing that certain sponsored listings for Personalcomfortbed.com resulting from searches using the trademarks Sleep Number, Sleep Number Bed, and /or Comfortaire are sites operated or owned by the company that makes Sleep Number or Comfortaire or are sites where a Sleep Number or Comfortaire bed can be purchased . . . [and] to assess the extent to which consumers mistakenly believe these are links for websites operated by the company that makes Sleep Number or Comfortaire beds or that these are websites where a consumer can buy a Sleep Number or Comfortaire bed;

> [and 2] whether consumers perceive the term "Sleep Number" to be a
> common term or a brand name.

(*See* Doc. No. 236 ("Hansen Aff.") ¶ 156, Ex. 153 ("Poret Report") at 1-2.)[7]  Defendants

move to exclude Poret's report and testimony on his likelihood-of-confusion survey

because they contend that the survey does not measure point-of-sale confusion and

because it is otherwise methodologically flawed.

First, Defendants again point out that the Court has determined that the initial

interest confusion doctrine does not apply to the facts of this case.  Defendants further

submit that Poret's likelihood-of-confusion survey focuses only on search engine results

pages and does not address point of sale confusion.  Poret's survey tested confusion from

Defendants' pay-per-click advertisements.  (Poret Report at 4-5 (noting that each test

group "simulated a Google search for a specific term [including "Sleep Number bed,"

"Sleep Number," and "Comfortaire"] and displayed actual search results including the

allegedly infringing listings for Personal Comfort Bed").  Specifically, Poret tested the

respondents' perception of the resulting listings.  (*Id.* at 5.)  Defendants contend that the

only confusion at issue is whether Personal Comfort Bed's websites or webpages cause

confusion, and because the Poret survey does not measure that confusion, it must be

excluded.

As discussed above, in the Summary Judgment Order, the Court declined to allow

for the application of the initial interest confusion doctrine, noting that Plaintiffs will

ultimately have to establish a likelihood of confusion at the time of purchase.  However,

---

[7]      Defendants do not contest Poret's credentials.

the Court did not dismiss Plaintiffs' trademark infringement claims, noting that the question of likelihood of confusion related to Defendants' advertisements will be for the jury to determine.  While Plaintiffs cannot base their infringement claim solely on initial interest confusion, Plaintiffs can present evidence of such confusion to the jury as part of their effort to prove the likelihood of point of sale confusion.  While not determinative, confusion caused by Defendants' advertising will be relevant to the jury's determination of whether there is a likelihood of confusion at the point of sale.  Defendants can cross-examine Poret on his survey evidence and can also submit evidence that any confusion abated by the time of purchase.

Defendants also argue that allowing evidence that the pay-per-click advertisements caused confusion will only confuse the jury considering that the initial interest confusion doctrine does not apply to this case.  The Court disagrees.  The jury will be duly instructed that it may not find trademark infringement based solely on evidence of initial interest confusion.  But any evidence that Defendants' advertisements caused confusion, and to what degree, will be relevant to the issue of whether such confusion continued to the point-of-sale.

Finally, the Court disagrees with Defendants' assertion that Poret's survey is methodologically flawed.  First, Defendants take issue with one question that asks about where one could purchase Plaintiffs' bed, arguing that the question is irrelevant as it does not elicit information about the source or affiliation of the beds at issue.  The Court disagrees.  Instead, the Court finds that the question is relevant to the question of source, affiliation, connection, and sponsorship confusion and, in particular, to the question of

18

whether a customer believes that Plaintiffs' products can be purchased through

Defendants (who are not authorized to sell Plaintiff's beds).  Second, Defendants argue

that this survey question is flawed because it is prefaced with a disclaimer—"[a]side from

the results you just selected"—before asking about the location of websites where

mattresses could be purchased.  (Poret Report at 10, 16, 22.)  Because a prior question

touched on who made the mattresses, Defendants argue that participants' responses after

the disclaimer (carving out responses on who made mattresses) only relate to where a

mattress can be purchased and shed no light on actionable confusion.  Again, questioning

participants about where one could purchase Plaintiffs' beds is relevant to the issue of

source, affiliation, connection, and sponsorship confusion.  In addition, any irregularity in

the question could be addressed by the test and control groups.  Defendants can

cross-examine Poret on this point and challenge the weight of his testimony at trial.

For the above reasons, the Court denies Defendants' motion to exclude Poret's

likelihood-of-confusion survey and testimony.  Poret's testimony will be presumptively

admissible assuming proper foundation is laid and subject to objections at trial.

### D.    Sarah Butler—Plaintiffs' Secondary Meaning Expert

Plaintiffs assert that Defendants have infringed their trademark "Number Bed."

"Number Bed" is not a registered mark, and therefore Plaintiffs must demonstrate that the

mark acquired secondary meaning before the date on which Defendants began using the

mark.  *See Co-Rect Prods., Inv. v. Marvy! Adver. Photog., Inc.*, 780 F.2d 1324, 1330 (8th

Cir. 1985).  Butler is a consumer survey expert whom Plaintiff retained to conduct a

survey to "evaluate whether or not the words NUMBER BED have secondary meaning

for consumers and are seen as words associated with the products of one company."
(Hansen Aff. ¶ 157, Ex. 154 ("Butler Report") at 4.)[8]  Butler opines that "Number Bed"
acquired secondary meaning based on a survey conducted in 2013.  (Doc. No. 231
("Zochert Aff.") ¶ 28, Ex. 27 ("Butler Dep.") at 38-41; Butler Report ¶ 8 ("[It] is my
opinion that a large proportion of mattress consumers believe that NUMBER BED is a
phrase or set of words associated with one company.").)

Defendants move to exclude Butler's secondary meaning report and testimony
because the survey was conducted in 2013, after the date on which Plaintiffs allege that
Defendants began using the same or similar mark.  Defendants assert that the survey
evidence is irrelevant because it was not gathered before Defendants' use of the allegedly
infringing words.  Plaintiffs, however, argue that even though the survey was conducted
after Defendants began their allegedly infringing conduct, it remains relevant.

Defendants contend that Stenzel and Baxter began using "Number Bed" no later
than June 20, 2012, and that Dires began using "Number Bed" in September 2012.  (Doc.
No. 279 at 4.)  Plaintiffs initiated this action against Dires and Baxter on November 16,
2012.  (Doc. No. 1.)  On January 25, 2013, Defendants asserted a counterclaim against
Plaintiffs seeking a declaration that their use of the "Number Bed" does not infringe
Plaintiffs' trademarks.  (Doc. No. 11 ¶¶ 6-16.)  The basis for Defendants' counterclaim is
that "Number Bed" is descriptive and lacks secondary meaning.  (*Id*.)  After Defendants
asserted this counterclaim, Butler designed and implemented her secondary meaning

---

[8]        Defendants do not contest Butler's credentials.

survey, which was completed in March 2013, roughly two months after Defendants filed their counterclaim.

Defendants cite to *Schwan's IP, LLC v. Kraft Pizza Co.*, 379 F. Supp. 2d 1016, 2024 (D. Minn. 2005) ("*Schwan's I*") for the proposition that post-infringement surveys are irrelevant for purposes of establishing secondary meaning.  In *Schwan's I*, the Court refused to consider plaintiff's secondary meaning survey for the term "Brick Oven" pizzas because the survey was completed after the defendants began to use the term.  379 F. Supp. 2d at 1024.  Plaintiffs, however, contend that the Eighth Circuit's decision in *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971 (8th Cir. 2006) ("*Schwan's II*") superseded the opinion in *Schwan's I*.  In *Schwan's II*, the Eighth Circuit affirmed the Court's decision in *Schwann's I*, and held that the district court did not err in ruling that "Brick Oven" was generic without considering survey evidence.  *Id*. at 976.  However, in considering whether the district court erred by not considering the survey evidence, the Eighth Circuit explained that a post-infringement secondary meaning survey is relevant for a "coined term" (when a party seeking protection created the mark), but not where evidence shows regular use of the alleged mark before the plaintiff sought trademark protection.  (*Id*. at 975-76.)  Plaintiffs further contend that such a situation is not present here because there is no evidence that "Number Bed" was used prior to Plaintiffs' advertisements.

The Court concludes that, assuming proper foundation is laid at trial, Butler's secondary meaning survey is relevant and admissible.  First, there is no evidence that "Number Bed" was used regularly prior to Plaintiffs' use of the term.  Second, aside from

the fact that the survey was conducted a few months after Defendants' allegedly

infringing use started, Defendants have not demonstrated that Butler's study does not

reflect the consumer associations that existed when Defendants began using the term.

For the above reasons, the Court deems the Butler Report presumptively admissible.

Defendants are free to cross-examine Butler and to challenge the weight of her testimony.

Thus, the Court denies Defendants' motion to exclude Butler's secondary meaning

survey and testimony.

### E.      Theodore H. Davis—Plaintiffs' Trademark Expert

Davis is a trademark attorney whom Plaintiff retained to render an opinion

evaluating Defendants' position that the Sleep Number mark "has become generic."

(Doc. No. 259 ¶ 3, Ex. 275 ("Davis Report") at 1, 8.)  In light of the Court's dismissal of

Counterclaim III (Cancellation), no genericness argument will be advanced at trial.

Accordingly, the Davis Report is irrelevant and properly excluded.

### F.      Uli Widmaier—Defendants' Trademark Expert

Widmaier is a trademark attorney whom Defendants retained to render an opinion

on "whether the term 'sleep number' . . . is a protectable trademark in connection with

the goods and services offered by Select Comfort."  (Patton Aff. ¶ 2, Ex. 1 ("Widmaier

Report") at 1.)  Again, in light of the Court's dismissal of Counterclaim III

(Cancellation), no genericness argument will be advanced at trial.  Accordingly, the

Widmaier Report is irrelevant and properly excluded.

## ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.      Dires Defendants' Motion to Exclude Testimony of Plaintiffs' Expert, Sarah Butler (Doc. No. [277]) is **DENIED**.

2.      Dires Defendants' Motion to Exclude in Part Testimony of Plaintiffs' Expert, Hal Poret (Doc. No. [280]) is **DENIED**.

3.      Dires Defendants' Motion to Exclude Testimony of Plaintiffs' Expert, Theodore Davis (Doc. No. [283]) is **GRANTED** in light of the Court's dismissal of Defendants' Counterclaim III.

4.      Dires Defendants' Motion to Exclude Expert Testimony of Renee Marino (Doc. No. [287]) is **DENIED**.

5.      Plaintiffs' Motion to Exclude Report and Opinions of Uli Widmaier (Doc. No. [291]) is **GRANTED** in light of the Court's dismissal of Defendants' Counterclaim III.

6.      Plaintiffs' Motion for Reconsideration (Doc. No. [325]) of the Court's Memorandum Opinion and Order (Doc. No. [270]) is **GRANTED IN PART** for the reasons described above insofar as the Court dismisses Counterclaim III.


Dated:  October 25, 2016                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge